**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| Florida Immigrant Coalition, Inc., Americans for Immigrant Justice, Inc., and Hope CommUnity Center, Inc., | Civil Action No. 1:22-cv-23927 |
| *Plaintiffs*, | |
| v. | |
| Ronald D. DeSantis, in his official capacity as Governor of the State of Florida; and Jared W. Perdue, in his official capacity as the Secretary of the Florida Department of Transportation, | |
| *Defendants*. | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT

### INTRODUCTION

This case is about the executive of one state infringing upon the federal government's immigration system by creating a separate, parallel immigration system. Florida's attempts to create its own immigration system came to a head on September 14, 2022, when individuals acting at the direction of Defendants sowed chaos and confusion by fraudulently inducing approximately 50 Venezuelan and Peruvian migrants, all of whom had been processed into the U.S. by immigration authorities, into taking a flight from Texas to Massachusetts, falsely promising them aid, jobs, and more. There was no aid. Indeed, no one in Massachusetts knew they would be arriving. But the Governor of Florida did, and he took credit for the stunt the next day. He proudly explained that he had funded this scheme through a section of the 2022 Florida appropriations act that set aside $12 million for the "relocation" of "unauthorized aliens" using monies derived from

federal funds intended to combat a deadly pandemic.  And he has vowed to use "every penny" of those $12 million to continue this unconstitutional scheme.  This case is about that section of the Florida appropriations act, which violates the Supremacy Clause by usurping the federal government's sole role in regulating and enforcing immigration law, muddying an already complex area of law, leading to chaos and confusion; and the Fourteenth Amendment's Equal Protection Clause, through its state-sponsored harassment of immigrants based on race, color, and national origin.

Plaintiffs, organizations who have been harmed by the passage and enforcement of the unconstitutional section of the appropriations act, seek an Order enjoining Defendants from further implementing Section 185 of House Bill 5001: General Appropriations Act ("Section 185") and a declaratory judgment that Section 185 is unconstitutional.

**PARTIES**

**A.  Plaintiffs**

1.      Plaintiffs are three nonprofit organizations that support immigrants and immigrant communities in Florida.

2.      Plaintiff **Florida Immigrant Coalition** ("**FLIC**") is a nonprofit corporation, duly organized under the laws of the State of Florida with its principal place of business in Miami, Florida.

3.      FLIC is a statewide coalition of more than 65 member organizations and over 100 allies, founded in 1998 and formally incorporated in 2004.  FLIC's staff cover six counties throughout Florida and FLIC's member organizations are located in over 20 Florida counties. FLIC's mission is to grow the connection, consciousness, and capacity of immigrant families, organizations, and communities so that everyone can live, love, and labor in Florida without fear.

FLIC conducts local, state, and national campaigns to shape representative and accountable governance.

4.     For example, FLIC's campaigns include We Are Florida – Civic Engagement, Driver's Licenses for All, We Are All America – Refugee Campaign, From the Root, Climate Justice, Temporary Protected Status ("TPS"), Deferred Actions for Childhood Arrivals and The Dream Act, and the Federal Campaign for Immigration Relief.

5.     FLIC supports citizens and immigrants that have various immigration statuses, including, for example, undocumented immigrants and those with TPS, refugees, persons seeking asylum, Lawful Permanent Residents, temporary visitors, and others.  FLIC also operates a toll-free hotline that provides information to immigrant communities, allies, and concerned stakeholders as it relates to citizenship, access to college, detention and deportation, and other basic social needs.

6.     Plaintiff **Americans for Immigrant Justice, Inc.** ("**AI Justice**") is a nonprofit corporation duly organized under the laws of the State of Florida with its principal place of business in Miami, Florida.

7.     AI Justice is an award-winning nonprofit law firm and advocacy organization that protects and promotes the basic human rights of immigrants.  AI Justice's mission is to protect and promote the basic human rights of immigrants through a unique combination of free direct services, impact litigation, policy reform, and public education at local, state, and national levels.

8.     In Florida and nationally, AI Justice champions the rights of unaccompanied immigrant children, advocates for survivors of trafficking, crime, and domestic violence, serves as a watchdog on immigration detention practices and policies, fights to keep families informed,

empowered, and together, and pursues redress on behalf of immigrant groups with particular and compelling claims to justice.

9.     Since its founding in 1996, AI Justice has served more than 145,000 individuals from 160 countries and has represented numerous individuals in their pursuit of lawful immigration status, including individuals subject to so-called immigration detainers.  AI Justice also represents clients challenging their confinement and/or conditions of confinement due to detention resulting from federal immigration violations.

10.     AI Justice also produces reports which detail evidence of civil liberty violations, testifies before Congress, and files lawsuits that challenge state and national laws.

11.     Plaintiff **Hope CommUnity Center, Inc.** ("**Hope CommUnity Center**") is a nonprofit corporation duly organized under the laws of the State of Florida and its principal place of business in Apopka, Florida.

12.     Hope CommUnity Center is a community-based and service-learning organization dedicated to the empowerment of Central Florida's immigrant community.

13.     Hope CommUnity Center's mission is to foster diverse, empowered, learning communities engaged in personal and societal transformation. Through service and advocacy, they stand together with immigrants and others who are tenacious and courageous in the face of all systems of oppression.  Its vision is to be the premier center of hope and empowerment for central Florida's immigrant community and all who face any system of oppression.

14.     Hope CommUnity Center serves approximately 6,500 people each year in Lake, Orange, Seminole, Volusia, and Osceola counties.  Many of the families with whom Hope CommUnity Center works are of mixed immigration status, having at least one family member who is undocumented, including some who are subject to immigration detainers.

15.     Hope CommUnity Center's programs and services include immigration, education, service learning, community organizing, and youth and families.

**B.  Defendants**

16.     Defendant **Ronald D. DeSantis ("Governor DeSantis")** is the Governor of the State of Florida.  He has publicly confirmed that the $12 million in funding set aside by Section 185 will continue to be used to unlawfully "relocate" people that Florida deems to be "unauthorized aliens" according to Florida's unique and incongruent definition of the term "unauthorized alien," a definition that is ambiguous and in conflict with federal law.  Defendant Governor DeSantis is sued in his official capacity.

17.     Defendant **Jared W. Perdue ("Secretary Perdue")** is the Secretary of the Florida Department of Transportation.  The funds set aside in Section 185 were appropriated to the Florida Department of Transportation to implement the relocation program.  Defendant Secretary Perdue is sued in his official capacity.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the U.S. Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343, because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights and to secure equitable or other relief for the violation of those rights.

19.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57.

20.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred, or will occur, in this District and a substantial number of Plaintiffs are located in this District.

21. Defendants, sued in their official capacities, both reside within the state of Florida.

STATEMENT OF FACTS

22.     In order to challenge and rewrite federal immigration law and policy, Governor DeSantis has implemented a separate, competing, and conflicting immigration law and policy scheme at the state level through lawsuits, state policies, legislation, and executive orders.

**A.  Legislative History of Section 185**

23.     On December 10, 2021, Governor DeSantis gave a press conference at the Jacksonville International Airport, where he announced his priority to take new actions to address immigration.[1]  During the press conference, Governor DeSantis announced that his administration "put out a very strong budget yesterday"[2] and said his office would be "proposing a series of legislative reforms" to address immigration and "the Biden border crisis."[3]  He added that "[i]n yesterday's budget, I put in $8 million for us to be able to transport people illegally out of the state of Florida," and floated the idea of relocating immigrants to "Martha's Vineyard or some of these places."[4]

24.     On or about February 10, 2022, the Florida House of Representatives introduced Florida House Bill 5001, the "General Appropriations Act" ("HB 5001") for Fiscal Year 2023.[5]

---

[1] *See* The Hill, *JUST IN: DeSantis Unveils New Actions to Combat 'Immigration Failures'*, YouTube (Dec. 10, 2021), https://www.youtube.com/watch?v=AqIsmv6LHpc.
[2] *Id.* at 0:40-0:43.
[3] *Id.* at 6:03-6:15.
[4] *Id.* at 9:00-9:20.
[5] *See Bill History: HB 5001 (2022) – General Appropriations Act*, Florida House of

The original version of HB 5001 did not contain Section 185 or any appropriation for Governor DeSantis' "relocation program."[6] A few days earlier, on February 4, 2022, the Florida State Senate had introduced its appropriations bill, SB 2500.[7] SB 2500 also did not include any provision allocating funds to a "relocation program," and it was ultimately substituted for the Florida House of Representatives appropriations bill, HB 5001.[8]

25.    HB 5001 was first introduced by State Representative Jay Trumbull on the Florida House Floor on February 10, 2022.[9] On February 15, 2022, State Representative Kelly Skidmore offered Amendment 990001, which did not add any provisions relating to the "relocation program."[10] The amendment was withdrawn, and HB 5001 was placed for a third reading.[11] On February 16, 2022, the original iteration of HB 5001 passed the Florida House of Representatives and was certified to the Florida Senate.[12]

26.    On February 17, 2022, State Senator Kelli Stargel proposed Amendment 889818, which proposed a new draft appropriations bill.[13] This draft of HB 5001 also did not include any

---

Representatives,    https://www.myfloridahouse.gov/Sections/Bills/billsdetail.aspx?BillId=76661 (last visited December 1, 2022); *see also Fla. H.R. Journal* 610 (Reg. Sess. 2022).

[6] *See* H.R. 5001, 2022 Leg., 124th Reg. Sess. (Fla. 2022).

[7]    *See Bill History: SB 2500: Appropriations*, The Florida Senate, https://flsenate.gov/Session/Bill/2022/2500/?Tab=BillHistory (last visited Dec. 1, 2022).

[8] *Id.*

[9] *Fla. H.R. Journal* 610 (Reg. Sess. 2022).

[10] H.R. 2022-990001, 124th Reg. Sess. (Fla. 2022).

[11] *Fla. H.R. Journal* 623–24 (Reg. Sess. 2022); *see also Bill History: HB 5001 (2022) – General Appropriations      Act*,      Florida      House      of      Representatives, https://www.myfloridahouse.gov/Sections/Bills/billsdetail.aspx?BillId=76661.

[12] *Fla. H.R. Journal* 656 (Reg. Sess. 2022).

[13] *See* S. 2022-889818, 124th Reg. Sess. (Fla. 2022); *Amendments: HB 5001: General Appropriations Act,* The Florida Senate, https://flsenate.gov/Session/Bill/2022/5001/?Tab=Amendments (last visited Dec. 1, 2022).

provision that allocated funds for Governor DeSantis' "relocation program."[14]  The Florida Senate referred HB 5001, as amended, to the Committee on Appropriations.[15]

27.     On or about March 10, 2022, the Florida House of Representatives Conference Committee amended the General Appropriations Act, adding Section 185, which appropriated $12 million to the Florida Department of Transportation to contract with common carriers to transport people deemed to be "unauthorized aliens" out of the state of Florida.[16]

28.     In its entirety, Section 185 provides as follows:

> From the interest earnings associated with the federal Coronavirus State Fiscal Recovery Fund (Public Law 117-2), the nonrecurring sum of $12,000,000 from the General Revenue Fund is appropriated to the Department of Transportation for Fiscal Year 2021-2022, for implementing a program to facilitate the transport of unauthorized aliens from this state consistent with federal law.  The department may, upon the receipt of at least two quotes, negotiate and enter into contracts with private parties, including common carriers, to implement the program.  The department may enter into agreements with any applicable federal agency to implement the program.  The term "unauthorized alien" means a person who is unlawfully present in the United States according to the terms of the federal Immigration and Nationality Act, 8 U.S.C. ss. 1101 et seq.  The term shall be interpreted consistently with any applicable federal statutes, rules, or regulations.  The unexpended balance of funds appropriated to the department in this section remaining as of June 30, 2022, shall revert and is appropriated for Fiscal Year 2022-2023 to the department for the same purpose.  This section shall take effect upon becoming a law.

FL LEGIS 2022-156, 2022 Fla. Sess. Law Serv. Ch. 2022-156 (H.B. 5001).

---

[14]      *See      Amendment      889818*,      The      Florida      Senate, https://flsenate.gov/Session/Bill/2022/5001/Amendment/889818/PDF.

[15] *Fla. S. Journal* 427–28 (Reg. Sess. 2022).

[16] *See* H. Appropriations Comm., 2022-447649, 124th Reg. Sess. (Fla. 2022); Appropriations Committee,      Conference      Committee      Amendment      447649, https://www.flsenate.gov/Session/Bill/2022/5001/Amendment/447649/HTML (last visited Dec. 1, 2022).

29.     A mere four days later, on March 14, 2022, the Florida House of Representatives passed HB 5001, as amended by the Conference Committee Report, which included Section 185.[17] That same day, the Conference Committee Report on HB 5001, with Section 185, also passed the Florida Senate.[18]

30.     Departing from the normal legislative procedural sequence, the aberrant timing of this process effectively eliminated any opportunity for the Florida Legislature to robustly debate Section 185.

31.     Section 185 was included in the state's appropriations act despite Article III, Section 12 of the Florida Constitution, which mandates that "[l]aws making appropriations for salaries of public officers and other current expenses of the state shall contain provisions on no other subject."  An appropriations act is not the proper place for the enactment of general public policies on matters other than appropriations.  Yet, in violation of Article III, Section 12 of the Florida Constitution, Section 185 establishes substantive policy, not salaries or other current expenses of the state.  As such, the "relocation program" contemplated by Section 185 should have been scrutinized through the legislative process applicable to substantive legislation, not slipped into the annual appropriations act

32.     HB 5001, including Section 185, was presented to Governor DeSantis on June 2, 2022, who approved it that same day.[19]

---

[17] *Fla. H.R. Journal* 1216, 1425 (Reg. Sess. 2022).
[18] *Fla. S. Journal* 1174, 1176–77 (Reg. Sess. 2022).
[19]   *Bill History: HB 5001: General Appropriations Act*, The Florida Senate, https://flsenate.gov/Session/Bill/2022/5001/?Tab=BillHistory (last visited Dec. 1, 2022).

**B.  Implementation of Section 185**

33.     Since the passage of Section 185, Defendants Governor DeSantis and Secretary Perdue have taken direct action to implement Section 185 by transporting asylum seekers from Texas to Massachusetts.

34.     Even before putting his "relocation program" into effect, Governor DeSantis and his administration threatened immigrant communities with its implementation.  On August 18, 2022, Florida Lieutenant Governor Jeanette M. Nuñez stated that Governor DeSantis had worked with the legislature to secure funds to send Cuban migrants, "very frankly, to the state of Delaware, the state of the President."[20]

35.     During this time, the Florida Department of Transportation was also developing guidelines for the "relocation program" created by Section 185 and seeking proposals from transportation companies to transport noncitizens out of Florida.  The Florida Department of Transportation's request for such proposals includes four deliverables: "Deliverable 1 - Establish procedure to receive requests from partner agencies; Deliverable 2 - Establish procedure for determining eligibility for relocation; Deliverable 3 - Provide transportation and all ancillary services; Deliverable 4 - Provide reports."[21]

36.     On September 14, 2022, Governor DeSantis launched his "relocation program," contracting private planes to transport approximately 50 immigrants from San Antonio, Texas, to

---

[20] *See* Bianca Padró Ocasio, *Did Florida's Lieutenant Governor Say "Illegal" Cuban Migrants Will Be Sent to Delaware?*, Tampa Bay Times (Aug. 22, 2022), https://www.tampabay.com/news/florida-politics/2022/08/22/did-floridas-lieutenant-governor-say-illegal-cuban-migrants-will-be-sent-to-delaware.

[21] *See* Grant Stern, *Florida Governor's Contract to Transport Immigrants to Martha's Vineyard Eliminated Key Safeguards, Chose High Bidder*, The Stern Facts (Oct. 7, 2022), https://grantstern.substack.com/p/florida-governors-contract-to-transport.

Martha's Vineyard, Massachusetts, and, upon information and belief, doing so without notification to any Massachusetts state or local officials.[22]

37.     In the days leading up to September 14, 2022, an agent of the Florida Department of Transportation, known as "Perla," reportedly introduced herself to individual families near a migrant shelter in San Antonio and handed out gift cards.[23] "Perla" also told migrants that she was offering a free flight to large cities in the Northeast, where they would receive all manner of assistance that she knew did not exist.[24]

38.     Instead, the migrants were tricked into boarding a plane through false promises and were dropped off at the Martha's Vineyard Airport.[25]

39.     On September 15, 2022, the day after the migrants were abandoned in Martha's Vineyard, Governor DeSantis issued a statement to the press taking credit for sending the migrants to Martha's Vineyard and publicly stated that the transportation was conducted pursuant to Section 185:

> Florida can confirm the two planes with illegal immigrants that arrived in Martha's Vineyard today were part of the state's relocation program to transport illegal immigrants to sanctuary destinations. States like Massachusetts, New York, and California will better facilitate the care of these individuals who they have invited into our country by incentivizing illegal immigration through their designation as "sanctuary states" and support for the Biden Administration's open border policies.

---

[22] *See* Jessica Chasmar, *Ron DeSantis Sends Two Planes of Illegal Immigrants to Martha's Vineyard,* Fox News (Sept. 14, 2022), https://www.foxnews.com/politics/ron-desantis-sends-two-planes-illegal-immigrants-marthas-vineyard.
[23] *See* Miriam Jordan, Remy Tumin, *"I Ended Up on This Little Island": Migrants Land in Political Drama*, N.Y. Times (Sept. 15, 2022), https://www.nytimes.com/2022/09/15/us/marthas-vineyard-venezuela-migrants.html.
[24] *See id.*
[25] *See id.*

> As you know, in this past legislative session the Florida Legislature appropriated $12 million to implement a program to facilitate the transport of illegal immigrants from this state consistent with federal law.
>
> Florida's immigration relocation program both targets human smugglers found in Florida and preempts others from entering.[26]

40.     There is not one scintilla of evidence—not in the legislation itself, not in the requests for bids, not in the Florida Department of Transportation policies—suggesting that Section 185 in any way "targets human smugglers" or that the individuals coerced onto the plane in Texas were or had any connection to "human smugglers."

41.     On the same day, Governor DeSantis told reporters that he intends to use "every penny" of the $12 million Florida budgeted for the "relocation" of immigrants, clarifying that "these are just the beginning efforts" and that they "got an infrastructure in place now" and "there's going to be a lot more that's happening."[27] A month later, Governor DeSantis' staff confirmed that "the immigration relocation program remains active."[28]

## C.  Governor DeSantis has consistently targeted immigrants of Latin American descent

42.     Section 185 is only one in a litany of actions Governor DeSantis and his administration have taken to target immigrants.  Governor DeSantis has undertaken multiple

---

[26] *See* Heather Morrison, *Read Florida Gov. Ron DeSantis' Statement on Immigrants Sent to Martha's Vineyard*, Mass Live (Sept. 15, 2022), https://www.masslive.com/news/2022/09/read-florida-gov-ron-desantis-statement-on-immigrants-sent-to-marthas-vineyard.html?outputType=amp.

[27] *See e.g.*, Steve Contorno, *DeSantis Vows Florida Will Transport More Migrants From Border to Other States*, CNN (Sept. 16, 2022), https://www.cnn.com/2022/09/16/politics/desantis-marthas-vineyard-migrants/index.html.

[28] Associated Press, *DeSantis Continuing Migrant Flights to Delaware, Other Democratic States*, Delaware Online (Oct. 17, 2022), https://www.delawareonline.com/story/news/nation/2022/10/17/desantis-continuing-migrant-flights-to-delaware-democratic-states/69567961007.

actions targeting immigrants by challenging federal immigration policies that would provide immigrants with dignity, due process, or protection, and is now attempting to implement his own system of competing immigration laws and policies at the state level.

43.     For example, Governor DeSantis, through the State of Florida, has twice sued the United States and federal government officials over their perceived failure to comply with immigration law and control the U.S.-Mexico Border.[29]

44.     Unable to obtain a court ruling to directly affect federal immigration policies, in September 2021, Governor DeSantis signed Executive Order 21-223, titled "Biden Border Crisis," wherein he directed Florida state agencies to address federal policies and actions concerning immigration and prohibited all Florida agencies under the purview of the Governor from "facilitating illegal immigration into Florida."[30]

45.     Governor DeSantis was also the driving force behind the now infamous "anti-sanctuary cities" law (SB 168), which impermissibly authorized and required the state and local law enforcement to perform the functions of federal immigration agents.[31]

46.     Finally, Governor DeSantis also pushed for the passage of SB 1808, yet another encroachment into federal immigration policy and procedure.  SB 1808 broadens the definition of

---

[29] *See, e.g.*, *Florida v. United States*, 540 F. Supp. 3d 1144 (M.D. Fla. 2021), *vacated*, No. 21-11715, 2021 WL 5910702 (11th Cir. Dec. 14, 2021); *Florida v. United States*, No. 3:21-cv-01066, Complaint for Declaratory and Injunctive Relief [Dk. 1] (N.D. Fla. Sept. 28, 2021).

[30] Office of the Governor, Exec. Order No. 21-233 (Sept. 28, 2021), https://www.flgov.com/wp-content/uploads/2021/09/EO_21-223.pdf; Press Release, Gov. Ron DeSantis, Governor Ron DeSantis Takes Action to Protect Floridians from the Dangerous Impacts of the Biden Border Crisis (Sept. 28, 2021), https://www.flgov.com/2021/09/28/governor-ron-desantis-takes-action-to-protect-floridians-from-the-dangerous-impacts-of-the-biden-border-crisis.

[31] *See City of South Miami v. DeSantis*, 561 F. Supp. 3d 1211 (S.D. Fla. 2021) (finding certain sections of SB 168 unconstitutional, in violation of the 14th Amendment's Equal Protection Clause by having a disparate impact on immigrant communities).  Florida appealed the court's decision to the U.S .Court of Appeals for the Eleventh Circuit.  *City of South Miami v. Florida*, No. 21-13657 (11th Cir.).

"sanctuary policy" previously incorporated into SB 168, requires all law enforcement agencies operating county detention facilities to enter into a cooperation agreement with the federal government pursuant to INA § 287(g), and prohibits all state and local government agency contracts with transportation companies, including private businesses, from "willfully" transporting an "unauthorized alien" into Florida.

**D.  Defendants' "relocation program" has harmed and will continue to harm Plaintiffs**

47.     The enactment of Section 185 has caused direct injury to each of the Plaintiffs.  The organizational resources and staff members of each organization have been strained as they work to answer the questions of their clients and members who have been impacted by the passage and implementation of Section 185.  Each of the organizations are now diverting resources away from their normal day-to-day campaigns and programs to deal with the fallout of Section 185.

48.     For example, FLIC's services, organizing, civic engagement, executive leadership, communications, and administration teams have all experienced a significant increase in workload since the passage of Section 185, and FLIC has had to change the way it manages its informational hotline to address the ways in which Section 185 may be implemented in Florida.  As a result, less staff time and fewer resources can be given to its other programs and initiatives.

49.     FLIC's communications department has had to mobilize all of its staff to respond to the passage and implementation of Section 185 throughout the state.  From digital means of sharing information to responding to an onslaught of press and community requests when the news of the Martha's Vineyard flight broke, the entire communications team has had to move rapidly, including in areas outside of their normal job descriptions and duties.  All other critical communications work, including electoral work, was put on hold by all members of the communications team for a substantial amount of time.

50.     FLIC's staff time and resources have been diverted to responding to questions related to the interpretation and implementation of Section 185, including how to avoid being targeted by Florida's "relocation program."

51.     The diversion of resources has resulted in a reduction of time spent on FLIC's core work and programs and has taken time from existing priorities for FLIC's other programs and initiatives, such as TPS advocacy and assistance, naturalization clinics, deferred action for child arrivals, family separation, hurricane preparedness and recovery, mutual aid, basic organizing, and core education programs.

52.     FLIC will be forced to continue diverting its resources from its communications, organizing, services, fundraising, and development departments, as well as its other programs, to address issues relating to Section 185.  These limitations will hinder FLIC's future ability to respond and provide support to its members and the immigrant communities they serve.

53.     Similarly, AI Justice has experienced an increase in telephone calls for legal information and services from clients and potential clients who are concerned about their and/or family members' possible transportation out of Florida by state officials.  To address the need for legal information, counsel and advice in response to Section 185, AI Justice has created Know Your Rights content, provided technical assistance to community-based partner organizations and civic leaders, created preparedness plans for clients and prospective clients who are at-risk of harm based upon Section 185's implementation, and invested time and resources distributing legal information to the community concerning Section 185.

54.     This work has significantly diverted AI Justice resources agency wide.  Advocates who staff AI Justice phone lines have observed an overall increase in telephone calls, which has decreased AI Justice's ability to answer other inquiries.  As a result, individuals calling AI Justice

to secure legal assistance for other reasons—including survivors of crime, human trafficking, and domestic violence—have been unable to make contact with AI Justice staff to request legal services through AI Justice telephone lines.  AI Justice's communications team has been tasked with creating and distributing information to increase community awareness regarding the implementation of Section 185.  AI Justice supervisory staff have provided internal guidance to staff regarding the implications of Section 185 to ensure that they are empowered to provide accurate information to AI Justice clients and the community-at-large.  Staff at every level of the organization have devoted considerable time and resources responding to questions from social and legal service providers on the implications of Section 185 and how to best support and serve affected individuals.

55.     Additionally, AI Justice has dedicated significant resources in evaluating Section 185 and to respond to inquiries from clients and the community because the implementation of Section 185, and to whom it will be applied, is so unclear.  This effort has required communicating with nonprofit providers and civic society leaders in Texas, Florida, and Massachusetts to determine how Section 185 has been applied and its implications for AI Justice clients, family members of AI Justice clients, and the community at-large.

56.     AI Justice anticipates increased legal services needs on behalf of clients who may be arrested or detained to facilitate their relocation out of Florida pursuant to Section 185.

57.     Since the passage and implementation of Section 185, Hope CommUnity Center has also diverted resources from its programs to address Section 185.  Hope CommUnity Center's additional resources, staff time, and funds will continue to be diverted from its other programs and services such as child education, family educational services, service learning, community organizing, and family work.  Specifically, Hope CommUnity Center has, and anticipates that it

will continue, to divert more staff time to creating circles of protection for the immigrant community in Apopka by providing information and education regarding their rights and the implications of Section 185.  Hope CommUnity Center has spent significant resources researching the manner in which the State of Florida would proceed with transporting persons out of the State of Florida as Defendants continue to implement Section 185.

58.     Hope CommUnity Center is also responding to an increase in members' needs arising from the fear of being targeted for transportation out of the State of Florida pursuant to Section 185.

59.     Defendants' actions have forced each of the Plaintiffs to divert resources from their other programs to address issues related to Section 185, and this harm will continue unless and until Section 185 is correctly ruled unconstitutional.

**E. Defendants' "Relocation Program" Conflicts with the Structure and Terms of the Federal Immigration System**

60.     The Immigration and Nationality Act ("INA"), as amended, is the primary statute that governs immigration law.  It defines the rights of noncitizens and dictates who is a United States citizen by birth or acquisition.  The statutory scheme is commonly deemed second only to the Internal Revenue Code in complexity.[32]

61.     The responsibility for carrying out our nation's immigration laws lies with the Secretary of the Department of Homeland Security ("DHS").  Within the DHS, the Bureau of Customs and Border Protection and the Bureau of Immigration and Customs Enforcement ("ICE") carry out immigration enforcement functions proximate to the border and within the interior of the

---

[32] *See Castro-O'Ryan v. U.S. Dep't of Immigr. & Naturalization*, 847 F.2d 1307, 1312 (9th Cir. 1987) ("With only a small degree of hyperbole, the immigration laws have been termed 'second only to the Internal Revenue Code in complexity.'  A lawyer is often the only person who could thread the labyrinth." (quoting E. Hull, *Without Justice For All* 107 (1985)).

country, respectively.  DHS's Bureau of Citizenship and Immigration Services ("USCIS") is responsible for the granting of citizenship and immigration benefits.

62.    Due to the nature of immigration law and the various forms of immigration relief a noncitizen may be eligible for, certain noncitizens may be "authorized" to be in the United States even though they do not have lawful immigration status.  For example, individuals who are released from detention on their own recognizance or permitted to enter the United States pursuant to a grant of parole may not have legal status but are "authorized" to be in the United States.  *See* INA §§ 236(a), 212(d)(5)(A).  Similarly, individuals in pending removal proceedings who have been issued a notice to appear—such as the individuals who were victims of Defendants' Martha's Vineyard stunt—as well as individuals with pending interviews with USCIS, are "authorized" to be in the United States although they commonly do not have lawful immigration status.

63.    In order to implement the complex set of federal law and regulations that govern immigration policy, the federal government provides extensive specialized training to DHS officers and agents who are tasked with determining, under the direct supervision and guidance of DHS attorneys, whether the individuals they encounter have legal authority to enter or remain in the United States and whether individuals who apply for immigration benefits are eligible to receive them.

64.    When an immigration officer or agent believes that an individual lacks authority to enter or remain in the United States, they initiate removal proceedings before the Immigration Court or Asylum Office as required by the INA.  After an initial decision regarding an individual's removability is made by the immigration judge or an asylum officer, the decision is subject to appeal.  Appellate rights most commonly include the right to appeal to the Board of Immigration Appeals and subsequently, to a federal Circuit Court of Appeals.

65.     The federal government also has a vast system to ensure enforcement of federal immigration law and, when appropriate, to execute orders of removal.  Noncitizens, depending on their immigration status and whether they are in any immigration proceedings, are subject to certain restrictions in their travel and must avail themselves of certain mandatory processes within the United States.  Noncitizens must frequently appear before an immigration judge or officer at locations designated by DHS or the Immigration Court at days and times determined by the federal government.  Deportation officers monitor the location of noncitizens with GPS technology through ankle monitor devices and "SmartLINK" applications.  When noncitizens fail to reside at the address approved by ICE, travel outside of a pre-determined ICE-approved geographic area, or fail to appear before an immigration judge or officer, they are flagged for ICE and may be subject to deportation.

66.     This coordinated national system of tracking and processing noncitizens in proceedings before DHS or the Immigration Court is upended and thrown into chaos when individuals who are required to appear before a federal agency in one location are unable to do so due to state intervention.  Thus, Defendants interfere with the regular enforcement of immigration law when they transport someone out of Florida.  This interference is uniquely egregious given the lack of any federal immigration law training or oversight provided to employees of the Florida Department of Transportation and its contractors, all of whom are ill-equipped to determine who has legal authority to remain in the United States or even assess who, though foreign-born, is a United States citizen or is otherwise authorized to be present in the United States.

**CAUSES OF ACTION**

**COUNT I**

**All Plaintiffs Against All Defendants**
**Section 185 Violates the Supremacy Clause of the U.S. Constitution**
**42 U.S.C. § 1983**
**Declaratory and Injunctive Relief**

67.     Plaintiffs repeat and reallege all paragraphs and, by reference, incorporate them by reference as though fully set forth herein.

68.     The Supremacy Clause of the Constitution of the United States establishes that the Constitution, federal laws made pursuant to it, and treaties made under its authority, constitute the "supreme law of the land." U.S. Const., Art. VI, cl 2.  The Supremacy Clause mandates that federal law preempts state law and policy in any area that is constitutionally reserved to the federal government, over which Congress has impliedly reserved exclusive authority where state law or policy conflicts or interferes with federal law.

69.     The federal power to determine immigration policy is well settled and federal governance of immigration and noncitizen status is extensive and complex.  8 U.S.C. § 1101 *et seq.*; *see Arizona v. United States,* 567 U.S. 387, 395–96 (2012).

70.     The power to determine who should and should not be admitted into the country has long been recognized as an exclusively federal power.  *See Fok Yung Yo v. United States*, 185 U.S. 296, 302 (1902); *Fong Yue Ting v. United States*, 149 U.S. 698, 706–07 (1893).  The power to exclude and the related federal power to grant permission to remain "exist as inherently inseparable from the conception of nationality."  *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936).  This is so because the federal government "is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties," which includes the field of immigration.  *Hines v. Davidowitz*, 312 U.S. 52, 62–63 (1941).

71.     The Constitution grants the federal government the power to "establish a uniform Rule of Naturalization," U.S. Const. Art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations, and among the several states," *id.*, cl. 3.  Courts have consistently seen the clear intention of Congress to provide a regulatory scheme of immigration law so pervasive that it occupies the field in this area of law and that Congress did not intend the states to supplement it.  Accordingly, efforts such as Defendants' to supplant federal immigration law with state policy are held unconstitutional.

72.     Section 185 impermissibly attempts to implement its own classification and/or characterization of immigration status, by providing an incoherent definition of the term "unauthorized alien."

73.     Section 185 then impermissibly attempts to authorize the Florida Department of Transportation to determine a person's immigration status based on Section 185's incoherent definition of "unauthorized alien"— a definition that does not comport with the federal legislative or regulatory scheme, including the INA.

74.     Section 185 defines "unauthorized alien" as "a person who is unlawfully present in the United States according to the terms of the federal Immigration and Nationality Act, 8 U.S.C. §§ 1101 et seq.,"—a cite to the *entire* INA.

75.     By incorporating *all* of federal immigration law by reference, Section 185 will require the Florida Department of Transportation (or the private companies the Florida Department of Transportation contracts with) and travelers to determine the incredibly complex nuances of immigration status and proceedings under the *entire* INA.  An impossible task, and, in fact, a task uniquely in the purview of the federal government.

76.     Section 185 constitutes a rewriting of national immigration policy.  Here is how Governor DeSantis explained this section of the budget:

> In yesterday's budget, I put in eight million dollars for us to be able to transport people here illegally out of the State of Florida, now we had mentioned, I said, you know, it's somewhat tongue-in-cheek, but it is true, if you sent them to Delaware or Martha's Vineyard or some of these places, that border would be secure the next day.[33]

77.     Passing over Governor DeSantis' slip of the tongue admission that his plan involves "transport[ing] people illegally," it is clear that the aim of Section 185 is a purported effort to "secure the border."[34]

78.     Governor DeSantis, however, is not empowered to secure the U.S.-Mexico border or determine who is allowed to pass through it.  That power rests with Congress, and Congress has passed extensive legislation on this topic.

79.     Where Defendants intend to transport persons already engaged in the federal immigration process, and then in-fact did transport persons engaged in the federal immigration process, Florida will and has already directly created chaos in the achievement of Congress' objectives.  Consider the chaos which would ensue if every state had attempted transport to another state those it deems to be "unauthorized aliens."

80.     The framework enacted by Congress leads to the conclusion here, as it has in prior Supreme Court jurisprudence, that immigration is an occupied field.  Though dressed as a state budget item, Section 185 is an effort to backhandedly control national immigration, and, as such, it is unconstitutional.

---

[33] *See supra* note 1.
[34] *See id.*

## COUNT II

**All Plaintiffs Against All Defendants**
**Section 185 Violates the Equal Protection Clause of the**
**14th Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**
**Declaratory and Injunctive Relief**

81.     Plaintiffs repeat and reallege all paragraphs and, by reference, incorporate them by reference as though fully set forth herein.

82.     The Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

83.     The implementation of Section 185 makes clear what is plain in Section 185 itself: this section was not designed as a benefit, but as an attempt to legalize state-sponsored harassment. That harassment is effectuated by unconstitutionally discriminating against a class of persons in violation of the Equal Protection Clause.

84.     On its face, Section 185's relocation scheme appears to target "unauthorized aliens."  In reality, it discriminates against immigrants and those perceived to be immigrants based on race and national origin.  Because Section 185 allows a state agency and/or its contractors to target and identify "unauthorized aliens," implementation will result in targeting people of color born primarily in Latin American and Caribbean countries to determine their immigration status, exposing non-white and foreign-born persons to discriminatory enforcement.

**A.  Section 185 is Unconstitutional Because it is the Product of Animus Against People of Color, Persons Born Outside the United States, and Those Perceived to Be Born Outside the United States**

85.     To protect individuals from laws that violate the spirit of Equal Protection but do so using pretextual language that hides either or both the intent or the effect of the legislature, courts for the last 45 years have relied on the fact-sensitive inquiry first described in *Village of*

*Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). There, the Court articulated a series of non-exhaustive factors that would guide lower courts in "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266.

86.     Those factors include, but are not limited to: (1) "the impact of the official action" and "whether it 'bears more heavily on one race than another'"; (2) "[t]he historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes"; (3) the "specific sequence of events leading up to the challenged decision"; (4) "[d]epartures from the normal procedural sequence"; (5) "[s]ubstantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and (6) "[t]he legislative or administrative history . . . , especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 266–68 (internal quotations omitted).

87.     The *Arlington Heights* framework was developed to deal with the difficulty inherent in identifying laws that effectuate prejudice under the guise of non-discriminatory language. The absence of explicitly discriminatory language does not protect the law from constitutional scrutiny; rather, it merely identifies how invidious its discriminatory intent and impact are.

88.     Legislative history aside, it is clear that the impact of the official action "bears more heavily on one race than another." *Id.* at 266 (internal quotation marks omitted). As described above, Plaintiffs are already suffering injuries caused by the increase in fear and uncertainty borne by the community of immigrants from Latin America and the Caribbean, who are overwhelmingly people of color. The discriminatory intention behind this law is clear to see when not read in a

vacuum.  Section 185 must be considered in light of similar and recent discriminatory efforts by the Florida legislature, particularly the passage of SB 168, correctly described by the U.S. District Court for the Southern District of Florida as the product of racial animus, finding two of its provisions unconstitutional because they violate the Equal Protection Clause.  *See City of South Miami v. DeSantis*, 561 F. Supp. 3d 1211, 1287 (S.D. Fla. 2021).  Learning from their mistakes in passing SB 168, the Florida legislature amended HB 5001 by adding this section to the annual appropriation act at the last second, avoiding almost all debate and preventing the development of a record that could more easily prove discriminatory intent.

89.     Since Section 185 fails the discriminatory intent test articulated in *Arlington Heights*, it must be ruled unconstitutional.

90.     Alternatively, Section 185 can only be explained as irrational prejudice against what Section 185 describes as "unauthorized aliens."  The intended targets of the statute are people of color who cross the United States border.  As such, it violates the Equal Protection Clause and is unconstitutional.

**B. In the Alternative, Even if the Court Does Not Find Racial Animus, the Appropriation Bill is Nonetheless Unconstitutional Because it Can Only Otherwise be Explained as Irrational Prejudice Against "Unauthorized Aliens."**

91.     When taking credit for the scheme, Governor DeSantis said the people transported were those most likely to travel to Florida.  Even though he acknowledged on August 23, 2022, that Florida was not receiving buses of migrants, revealing that Florida was not suffering from record amounts of noncitizen migrations to Florida, Governor DeSantis nonetheless told reporters the overarching aim of the policy was to change federal immigration policy.

92.     Whether located in Texas, Florida, or parts unknown, there is no doubt that the intended targets of the "relocation program" are people of color arriving from nations south of the

U.S./Mexico border.[35]  That patently obvious reality helps explain why a scheme paid for by Florida to "relocate" "unauthorized aliens" ended up targeting and transporting Venezuelans and Peruvians out of Texas who were paroled into the country, many of whom are seeking asylum.

93.     Governor DeSantis' actions and statements leave little doubt that Defendants intend to spend the $12 million to target and relocate immigrants from Latin America and the Caribbean out of Florida.[36]  Since the law discriminates on the basis of race and national origin, it must be reviewed under the exacting standard of strict scrutiny, which requires that any state discrimination be necessary to advance a compelling government purpose.  *See*, *e.g.*, *Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267, 274 (1986).

94.     Yet, even if a court were to apply the lesser rational basis standard Section 185 would still fail:  immigrants in the United States provide tangible benefits to the communities where they choose to relocate, economic and otherwise.  Spending $615,000 to transport asylum-seekers from Texas to Massachusetts does not further a legitimate interest, it merely perpetuates xenophobia and hate by targeting Latin American and Caribbean migrants.  Where the only justifications for a discriminatory law are based in prejudice, the law is unconstitutional even under rational basis review.  *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985).  And where a law is passed merely to "harm a politically unpopular group," the law does not further a legitimate government interest, and the result is the same.  *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996).

---

[35] *See, e.g.*, *supra* note 30 (discussing the need to respond to the "Biden administration's policy of apprehending large number of illegal aliens at the Southwest Border"); *supra* note 1 at 9:00 (discussing sending migrants to Delaware or Martha's Vineyard in order to "secure the border").
[36] *See supra* note 28 ("While Florida has had all hands on deck responding to our catastrophic hurricane, the immigration relocation program remains active.").

**PRAYER FOR RELIEF**

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs request that this Honorable Court:

    a.  Assume jurisdiction over this matter;

    b.  Preliminarily and permanently enjoin Section 185 of HB 5001;

    c.  Declare Section 185 of HB 5001, in its entirety, unconstitutional;

    d.  Grant Plaintiffs' costs of suit, and reasonable attorneys' fees and other expenses pursuant to 42 U.S.C. § 1988; and

    e.  Grant any other relief as the Court may deem just and proper.

Dated: December 1, 2022

Respectfully submitted,

/S/ Paul R. Chavez
Paul R. Chavez
Fla. Bar No. 1021395
Southern Poverty Law Center
2 S. Biscayne Boulevard, Suite 3750
Miami, FL 33131
P: (786) 347-2056
paul.chavez@splcenter.org

George J. Leontire*
Felicia L. Carboni*
LEONTIRE & ASSOCIATES, P.C.
P.O. Box 4328
Westport, MA 02740
P: (855) 223-9080
F: (508) 207-9747
george@leontirelaw.com
felicia@leontirelaw.com

Luz Lopez*
Southern Poverty Law Center
1101 17th Street NW, Suite 705
Washington, D.C. 20036
P: (404) 387-9314
luz.lopez@splcenter.org

Ronald S. Sullivan Jr.*
Director, Criminal Justice Institute
Harvard University
1607 Massachusetts Avenue
Cambridge, MA 02138
P: (617) 496-4777
F: (617) 496-2277
rsullivan@law.harvard.edu

Stephanie M. Alvarez-Jones*
Southern Poverty Law Center
150 E. Ponce De Leon Avenue, Suite 340
Decatur, GA 30030
P: (470) 747-8265
stephanie.alvarezjones@splcenter.org

*Application for admission *Pro Hac Vice* forthcoming

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 1, 2022, the foregoing was electronically filed with the Clerk of the Court with the ECF system, and that the same will be timely served on all Defendants in accordance with the Federal Rules of Civil Procedure.

By: <u>/s/ Paul R. Chavez</u>
Paul R. Chavez
Counsel for Plaintiffs
